CLAPP SPOONER *vs.* DANIEL PHILLIPS AND ANOTHER.

New Haven & Fairfield Cos., April T., 1892.  ANDREWS, C. J., CARPENTER, SEYMOUR, TORRANCE and FENN, JS.

The plaintiff in 1857, transferred to the defendant *P* ten shares of stock of the Adams Express Company in trust for *G*, who was the mother of his deceased wife, the trust being expressed in the instrument as follows:— " to pay over to her the dividends and income thereof during her natural life, and upon her decease to transfer said stock to me or my heirs, executors and administrators," the consideration being stated to be " friendship and affection." The ten shares were increased from time to time by the company, and at the time of *G's* death there stood in *P's* name as trustee sixty-six shares. The new shares were apportioned among existing shareholders. Held that the fifty-six new shares belonged to the plaintiff, and not to the administrator of *G's* estate.

The life use of the stock by *G* being a gift to her, the intent of the donor as expressed in the instrument was the decisive consideration in the matter; and that intent as thus expressed was that she should receive only the " dividends and income " of the stock.

The word " dividends," if unqualified, signifies dividends payable in money. The word " income " has a broader meaning, but not broad enough to include anything not separated in some way from the principal. Accumulated surplus, so long as it is retained by the corporations, either as surplus or increased stock, can in no proper sense be called income.

It is well settled in this state that a corporation, an association in the nature of a corporation, and even an ordinary partnership, own the undivided earnings of the business, rather than the stockholders, shareholders or partners; also that the latter cannot become the separate owners of any part of the common property until set apart by the management for that purpose, by declaring a dividend or

otherwise; and that the courts will, in the absence of fraud, allow the management to exercise its powers in its discretion, and will not interfere to compel dividends at the instance of a minority in interest.

Argued April 22d—decided May 28th, 1892.

SUIT for recovery in equity of sixty-six shares of stock of the Adams Express Company, held by the defendant Phillips as trustee; brought to the Superior Court in Fairfield County. The defendant Henry R. Parrott, administrator of the estate of Mary Ann Garland, the original beneficiary for her life under the trust, filed an answer and counterclaim, setting up a claim in behalf of her estate to fifty-six shares of the stock, and the court ordered an interpleader between the plaintiff and this defendant. The facts were found by a committee and the case reserved on the facts for the advice of this court. The case is fully stated in the opinion.

*C. R. Ingersoll* and *H. H. Knapp*, with whom was *M. W. Seymour*, for the plaintiff, cited—*Phelps* v. *Farmers' & Mechanics' Bank*, 26 Conn., 269; *Pratt* v. *Pratt, Read & Co.*, 33 id., 446; *Brinley* v. *Grou*, 50 id., 66; *Batterson* v. *Town of Hartford*, id., 558; *Lockwood* v. *Town of Weston*, 61 id., 211; *Williams* v. *Western Union Tel. Co.*, 93 N. York, 162; *Kernochan's Case*, 104 id., 618; *Beveridge* v. *N. York Elevated R. R. Co.*, 112 id., 127; *Platt* v. *Wemple*, 117 id., 136; *People ex rel. Union Trust Co.* v. *Coleman*, 126 id., 433; *Rand* v. *Hubbell*, 115 Mass., 461; *Boston & Albany R. R. Co.* v. *Pearson*, 128 id., 445; *Richardson* v. *Richardson*, 75 Maine, 570; *Brown* v. *Larned*, 14 R. Isl., 371; *Gibbons* v. *Mahon*, 136 U. S. R., 549, 558.

*L. Warner*, with whom was *A. B. Beers*, for the defendant Parrott, cited—Cook on Law of Stock & Stockholders, §§ 554 *a*, 557; 2 Beach on Private Corporations, § 600; 1 Morawetz on Private Corporations, §§ 468, 469; *Earp's Appeal*, 28 Penn. St., 368; *Wiltbank's Appeal*, 64 id., 256; *Moss's Appeal*, 83 id., 264; *Thompson's Appeal*, 89 id., 36; *Roberts's Appeal*, 92 id., 407; *Biddle's Appeal*, 99 id., 278;

*Vinton's Appeal,* id., 434; *Van Doren* v. *Olden,* 19 N. Jer. Eq., 176; *Ashhurst* v. *Field,* 26 id., 1; *Lord* v. *Brooks,* 52 N. Hamp., 72; *Richardson* v. *Richardson,* 75 Maine, 570; *Clarkson* v. *Clarkson,* 18 Barb., 646; *Riggs* v. *Cragg,* 26 Hun, 89, 103.

CARPENTER, J. The plaintiff in 1857 transferred to Daniel Phillips, in trust for the use of Mary Ann Garland for life, or until she should marry, ten shares of the stock of the Adams Express Company, a joint stock association organized under the laws of the state of New York, by an instrument in writing, as follows:

"Know all men by these presents that I, Clapp Spooner, of the city of Bridgeport, in Fairfield County, Connecticut, for value received, have bargained, sold, assigned and transferred, and by these presents do bargain, sell, assign and transfer, unto Daniel Phillips, of Hartford, ten shares of the capital stock of the Adams Express Company, a joint stock association established under and by virtue of the laws of the state of New York, standing in my name on the books of said association, in trust to and for the use of Mrs. Mary Ann Garland of said city of Bridgeport; to have and to hold the same as such trustee and for the use aforesaid, and to pay over to her the dividends and income thereof during the natural life of the said Garland, and upon her decease, or sooner determination of said trust, to re-convey and transfer said stock to me or my heirs, executors and administrators. This assignment is made upon the express condition that the said Garland shall remain sole, single and unmarried during her life, and further, that in the event of her marriage all right, title and interest which she has in or to said stock by virtue of said trust shall thereafter cease and determine, and the same shall revert to me, my heirs, etc. as hereinbefore provided. In witness whereof I have hereunto set my hand and seal, this 3d day of March, 1857.

"CLAPP SPOONER. L. S.

"The true consideration for said transfer and said instrument were friendship and affection."

The ten shares were increased from time to time by the action of the association, so that, at the time of the death of Mrs. Garland, there stood in the name of Mr. Phillips sixty-six shares.  The new shares were not, strictly speaking, the product of stock dividends, nor do they represent, in the ordinary sense, surplus earnings; but as the business of the concern increased by its extension over new routes and into new territory, and perhaps by the purchase of local express firms, as the articles of association clearly contemplate, it is evident that the property and facilities for doing the increased business would also increase, the plant would become more valuable, and its earning capacity increased.  In this state of things the association deemed it expedient to increase the number of shares into which its property was divided.  This was done by apportioning the new shares *pro rata* among existing shareholders, so that after each increase, as before, each share represented a definite proportion of the property of the association, including the good will.

Mr. Spooner now claims that the sixty-six shares belong to him; Henry R. Parrott, the administrator of Mrs. Garland's estate, claims that the increase of stock, fifty-six shares, belongs to the estate and should be transferred to him.

The parties interpleaded pursuant to an order of the Superior Court.  The facts were found by a committee, and the case was reserved for the advice of this court.

Our first inquiry is as to the intention of the parties. What did Mr. Spooner intend to give, and what did he intend to reserve to himself?  And what did Mrs. Garland suppose at the time that she was to receive?  In this, as in other cases where the parties have put their transaction in writing, we must look to the writing itself for the purpose of ascertaining their intention.  The language is very brief and very simple—" In trust to and for the use of Mrs. Mary Ann Garland."—" To have and to hold the same as such trustee and for the use aforesaid, and to pay over to her the dividends and income thereof during the natural life of the said Garland, and upon her decease, . . . . to re-convey and

transfer said stock to me or my heirs," etc. This language can have but one interpretation. The use, which includes and consists in fact of the dividends and income, belonged to Mrs. Garland. The stock itself, which carries with it any appreciation in value, or any depreciation, belongs to Mr. Spooner. It will hardly be admitted by the representative of Mrs. Garland that if the business had been unfortunate and the stock had depreciated in value, her estate should make good the deficiency. If Mr. Spooner should bear the loss in the one case, why should he not in the other receive the gain? Loss and gain in commercial enterprises usually fall to the lot of the same party.

What is the ordinary meaning of the *use* of a thing? It is not the thing itself, or any part thereof, but is that which the thing will produce. If it is a house or other building, or any other form of real estate, it is the rent which can be. obtained for it. If it is money, it is the interest which it will earn. If stock in a corporation or other form of commercial partnership, it is the profit which may be reasonably set apart, and is in fact set apart, by the management as the separate property of the shareholder. Such profit is usually denominated dividends or income.

But it may be said that the increase of shares represents earnings which might have been, and therefore ought to have been, distributed to the shareholders in the form of dividends; and that Mrs. Garland during her lifetime had, and her estate now has, an equitable claim to such earnings. That brings us directly to the real debatable question in the case.

We remark, in the first place, that the transaction between Mr. Spooner and Mrs. Garland, being in the nature of a gift, we fail to discover any ground on which equitable considerations can be urged in favor of Mrs. Garland, the donee. It is a question of intention—the intention to be gathered from the transaction and the language of the instrument creating the gift. And here it is proper to add that the intention we are seeking after is mainly the intention of the donor. In mutual contracts, where both parties expect to

derive some benefit, we look for the intention of both parties; and anything of which it can be said that either party did not agree to it, will not be considered as within the intention. Not so with a gift. That is not the subject of negotiations. It is the act of one party. He alone fixes the terms and conditions to please himself. The other simply accepts or rejects. He ordinarily is not in a situation to impose conditions, or even to ask for more favorable terms. The law raises no presumptions and no equities in favor of the donee which are not expressed by, or fairly inferred from, the language or conduct of the donor. As in wills it is the intention of the testator which governs, so in gifts it is the intention of the giver which prevails.

Let us examine this record with some care for the purpose of discovering what the will of Mr. Spooner was with respect to these earnings, conceding that the new shares represent earnings. We have already examined the instrument creating the trust for another purpose. We will add in this connection that we find in it no language sufficiently comprehensive to include earnings which the management has never set apart to be the separate property of the shareholder, nor in any other way placed to his credit. Until some such act is done the earnings can in no proper sense be said to be the separate property of the individual shareholder. Until then they are within the exclusive control, and must be regarded as the property, of the association. The declaration of a stock dividend is not sufficient. That merely gives the receiver of the stock certain rights, but it gives him no title to any portion of the property of the corporation, and no individual right to control it or interfere with its management. If it had been intended that Mrs. Garland should have all the earnings, even though they remained a part of the common property, it would have been very easy to express that intention. A few words of general but comprehensive import,—"all stock dividends," "all earnings whether capitalized or not," or any similar words would have been sufficient. The absence of any such language is significant.

Spooner v. Phillips.

The use of the stock seems to be limited to the receipt of dividends and income. The word "dividends," if unqualified, signifies dividends payable in money. The word "income" has a broader meaning, but hardly broad enough to include things not separated in some way from the principal. It is not synonymous with "increase." The value of stock may be increased by good management, prospects of business and the like, but such increase is not income. It may also be increased by an accumulation of surplus; but so long as that surplus is retained by the corporation, either as surplus or increased stock, it can in no proper sense be called income. It may be income-producing, but it is not income.

Is there anything in the situation of the parties, the object they had in view, or the circumstances attending the transaction, which will justify the inference that Mr. Spooner intended that Mrs. Garland should have any portion of the property in controversy as her own? On the contrary, do they not all unite in suggesting that the interpretation we have placed upon the transaction is the correct one? Mrs. Garland was the mother of his deceased wife; in consideration of "friendship and affection" purely he was desirous of contributing towards her support. Beyond the power of revocation he placed property in the hands of a trustee that would, in all probability, yield a cash income at stated intervals. He carefully provided that she should be relieved from all care and responsibility in the management of the property. We may presume that he intended that she should have the benefit of the increased income arising from any probable increase in the number of shares by stock dividends or otherwise; for that is precisely what she did receive without objection from any source. On the other hand, we may not presume that he intended that she should receive the increment of stock as her own absolute property; for that was precisely what she did not receive. At one time, about fifteen years since, she claimed it, but her claim was denied, and she did not further press it—a pretty strong instance of a practical construction of a transaction by the parties. And now, after so long a time,

and after the death of Mrs. Garland, her administrator renews the claim. We cannot see that the claim in his hands is stronger or more equitable than it was when presented by Mrs. Garland.

Mr. Spooner's relation to the association, his knowledge of its business and prospects, and his anticipations of gain from it, are circumstances which ought not to be overlooked. The association was formed in 1854. Mr. Spooner was one of the original promoters. The fact is not expressly found, yet we can perceive and may safely assume that the association was formed by a combination of several companies, firms and individuals previously engaged in the express business ; the object being to bring the business, then extensively carried on over a large part of the United States, under one management. It will be observed that the articles provide for no definite amount of capital, and there is no par value to the shares of stock. It would seem that the property then invested or employed in the business was brought together in one concern, and, either with or without an appraisal, was divided into twelve thousand shares, and the shares divided among the persons concerned according to their respective interests, except about twelve hundred shares which were to belong to the association.

It is easy to see that the advantages resulting from the consolidation would cause the business to increase to such an extent that it could hardly fail to be profitable. Moreover it was foreseen that the business of the concern would be likely to increase in another direction. That was provided for in the following extract from the articles of association :—" And for the purpose of enabling us to carry on our said business more advantageously to the public and satisfactorily to ourselves, other persons and corporations or companies who shall contribute to the joint stock, or shall be permitted to acquire interests in the business of the company, shall be admitted to participate in its profits and share in its losses, according to the stipulation herein contained."

It is also provided that the number of shares " may from time to time be increased or diminished." Accordingly the

ninth article provides that " the board of managers may, with the consent in writing of three fourths in interest of the shareholders, from time to time increase the number of shares of the association, and when so increased may issue the increased shares to the existing shareholders, *pro rata*, according to their existing interests, or dispose thereof to such others as the said board may approve, and the money or property received therefor be applied to the benefit of the association."

It is impossible for us to perceive any ground on which we can presume that Mr. Spooner intended that Mrs. Garland should have any of the increased shares thus provided for.

We have little space, and perhaps there is little occasion, to speak of the legal questions discussed. We believe that the question in this case, and in all cases of like character, is one of intent. Life estates are more frequently created by will, sometimes by donation, and sometimes by contract. However created, the main question is, what did the testator, the donor or the contracting parties, as the case may be, intend? When that intention is discovered it should control. If we are correct in the views hereinbefore expressed, we really have no occasion to go further. But if wrong, or if there is room for doubt, then in some aspects of the case it may be important to consider the legal questions.

It is well settled in this state that a corporation, an association in the nature of a corporation, and even an ordinary partnership, own the undivided earnings of the business, rather than the stockholders, shareholders or partners; also that the latter cannot become the separate owners of any part of the common property until set apart by the management for that purpose, by declaring a dividend or otherwise; also that the courts will, in the absence of fraud, allow the management to exercise its powers and duties, and will not interfere to compel dividends at the instance of a minority in interest, and much less at the instance of one entitled only to the use of stock for life as a gift against the interest of a donor. It follows conclusively that in the case of a concern con-

tinuing a successful business, and after a life estate is ended, the courts will not, except for very strong reasons, go back for a period of a quarter of a century or more, and treat assets which the company has converted into stock for the benefit of the donor, as dividends for the benefit of the estate of the life tenant. It need hardly be added that no reason whatever appears in the present case why the court should take that course.

A reference to a few only of the many cases bearing upon this general subject will suffice.

In *Pratt* v. *Pratt, Read & Company*, 33 Conn., 446, this court refused to interfere in behalf of a minority of stockholders and restrain the company from using a large surplus as capital in erecting a large building, and also refused to decree a distribution of the surplus in dividends. If the court will not require the company to make a dividend it is difficult to see upon what principle it will itself make a dividend.

In *Phelps* v. *Farmers' & Mechanics' Bank*, 26 Conn., 269, it was held that " the profits of a bank, no matter when made, until separated from the stock by declaring a dividend, are mere increment and augmentation of the stock. They are properly stock themselves, composing a part of the stock of the bank, and will pass with the stock under that name, either by contract or by levy of execution."

In *Brinley* v. *Grou*, 50 Conn., 66, the facts were briefly these:—A testator left $100,000 to trustees for his four children equally during their lives, the " rents, dividends, increase and income thereof " to be paid to them annually. Some years later the accumulated profits of a fire insurance company, of which the trustees held a large amount of stock, equaled the capital of the company. The company then increased its capital from three to four millions, apportioning the new shares *pro rata* among the stockholders at par. The trustees subscribed for a portion of the shares to which they were entitled, and sold the right to subscribe for the remaining shares at a considerable premium. This court held that the right to subscribe for the new shares, the profit

on a sale of the right, and the new shares taken, went to the trustees as a part of the principal of the fund, and not to the children as a part of the income. See also *Hotchkiss v. Brainard Quarry Company*, 58 Conn., 120. It is conceded that the law of Massachusetts is in substantial harmony with our own. We therefore content ourselves with referring to two cases, *Minot* v. *Paine*, 99 Mass., 101, and *Rand* v. *Hubbell*, 115 Mass., 461.

We quote at some length from the cases in the state of New York, inasmuch as it is claimed that the law of that state differs from our own. We think it is substantially the same.

In *Hyatt* v. *Allen*, 56 N. York, 553, the head note is:—" A shareholder in a corporation has no legal title to its property or profits until a division is made; and a contract by him in reference to dividends and profits upon his stock includes only dividends or profits ascertained and declared by the company and allotted to the stockholders, and not profits to be ascertained by third persons or courts of justice upon an investigation of the accounts and transactions of the company."

. In *Matter of Kernochan*, 104 N. York, 618, the court says: —" As soon as the profits on shares of stock are ascertained and declared, they cease to be the property of the company, and the owner of the shares becomes entitled to the dividend. It at once forms part of his estate. The fact that they are made payable at a future time is immaterial. The dividend to which the life tenant may be entitled as income, can only be that which the company declares after that relation is acquired."

On another point in the same case it is said:—" The referee made the apportionment in question by ascertaining how much was earned before and how much after the death of the testator, and so doing applied a rule which may be founded on general equity, namely, that when a fund is given for life to one beneficiary and remainder over, the first shall have its earnings after his life tenancy begins, and the remainderman the balance. I find nothing in the will

which indicates that the testator intended any such investigation or division, or that any other than the ordinary rule which gives cash dividends declared from accumulated earnings or profits to the life tenant, should be applied. The direction to his executor is to receive the rents, interest and income of his estate, and apply the net amount of such rents or other income to the use of his wife. From the shares in question no income could accrue, no profits arise to the holder, until ascertained and declared by the company and allotted to the shareholder, and that act should be deemed to have been in the mind of the testator, and not the earnings or profits as ascertained by a third person or by the court upon an investigation of the business and affairs of the company, either upon an inspection of their books or otherwise."

In *Beveridge* v. *N. York Elevated R. R. Co.*, 112 N. York, 1, the court says (p. 27) :—" A shareholder in a corporation has no legal title to the property or profits of the corporation until a division is made or a dividend declared. He acquires no right or title to the accumulated gains from the revenues of the corporation, which entitles him to sue for his aliquot share of dividends. Until divided by the directors or trustees of the corporation, all of its property is held in joint ownership by the corporators, and no several right is possessed by the individual stockholder until a dividend is declared. The declaration of a dividend from a surplus, or a division of profits, is within those discretionary powers of the directors or trustees which will not be controlled by the courts. *Williams* v. *W. U. Tel. Co.*, 93 N. York, 162."

An important case on this subject is *Gibbons* v. *Mahon*, 136 U. S. R., 549, which so thoroughly sustains the views we entertain that we quote from it at some length. It is there said :—" Money earned by a corporation remains the property of the corporation, and does not become the property of the stockholders, unless and until it is distributed among them by the corporation. The corporation may treat it and deal with it, either as profits of its business, or as an addition to its capital. Acting in good faith and for the

best interests of all concerned, the corporation may distribute its earnings at once to the stockholders as income ; or it may reserve a part of the earnings of a prosperous year to make up for a possible lack of profits in future years ; or it may retain portions of its earnings and allow them to accumulate, and then invest them in its own works and plant, so as to secure and increase the permanent value of its property. Which of these courses shall be pursued is to be determined by the directors, with due regard to the condition of the company's property as a whole ; and, unless in case of fraud or bad faith on their part, their discretion in this respect cannot be controlled by the courts, even at the suit of owners of preferred stock, entitled by express agreement with the corporation to dividends at a certain yearly rate, 'in preference to the payment of any dividend on the common stock, but dependent on the profits of each particular year, as declared by the board of directors.'   Reserved and accumulated earnings, so long as they are held and invested by the corporation, being part of its corporate property, it follows that the interest therein represented by each share is capital, and not income of that share, as between the tenant for life and remainderman, legal or equitable, thereof. * * * Whether the gains and profits of a corporation should be so invested and apportioned as to increase the value of each share of stock, for the benefit of all persons interested in it either for a term of life or of years or by way of remainder in fee, or should be distributed and paid out as income to the tenant for life or for years, excluding the remainderman from any participation therein, is a question to be determined by the action of the corporation itself, at such times and in such manner as the fair and honest administration of its whole property and business may require or permit, and by a rule applicable to all holders of like shares of its stock ; and cannot, without producing great embarrassment and uneasiness, be left open to be tried and determined by the courts, as often as it may be litigated between persons claiming successive interests under a trust created by the will of a

single stockholder; and by a distinct and separate investigation."

The case then goes on to hold that, in ascertaining the rights of such persons, the intention of the testator, so far as manifested, must of course control; and that "when he has given no special direction upon the question as to what shall be considered.principal and what income, he must be presumed to have had in view the lawful power of the corporation over the use and apportionment of its earnings, and to have intended that the determination of that question should depend upon the regular action of the corporation with regard to all its shares." It then holds that "ordinarily a dividend declared in stock is to be deemed capital, and a dividend in money is to be deemed income of such share."

The Superior Court is advised that the equitable title to said sixty-six shares of the Adams Express Company is in Clapp Spooner, and that said Daniel Phillips should be required to transfer and deliver to said Spooner, by proper instrument, said sixty-six shares, together with all dividends received by him since the death of Mrs. Garland, (subject to the payment of the charges stated in the preliminary order,) and to give judgment accordingly.

In this opinion the other judges concurred.